In the Matter of LEO ISAACSON, Petitioner, against WILLIAM J. HEFFERNAN et al., Constituting the Board of Elections of the City of New York, et al., Respondents.

Supreme Court, Special Term, Bronx County, August 12, 1946.

*Milton R. Weston* for petitioner.

*John J. Bennett, Corporation Counsel (Arthur Kerns* of counsel), for Board of Elections, respondent.

*Samuel J. Joseph* for William J. Drohan, respondent.

McNally, J. The petitioner seeks a final order declaring invalid the petition purporting to designate William J. Drohan as candidate of the Republican Party for Member of Assembly from the 13th Assembly District in Bronx County, New York, and filed with the Board of Elections.

The basis of the relief sought is set forth in the petition as lack of the legal period of residence in the 13th Assembly District by respondent for "twelve months immediately preceding his or her election" as required by the State Constitution (N. Y. Const., art. III, § 7).

The salient facts are as follows: Respondent, who is single, resided with his parents at 2995 Botanical Square, Bronx County, since 1938. On February 2, 1943, he entered the armed services of the United States, and while in the service and in June of 1945, his parents moved to Queens County. In the general election of 1944, and again in the general election of 1945 respondent cast his vote by absentee ballot and in each case gave 2995 Botanical Square as his residence. On June 6, 1946, respondent signed the registration day book of the Board of Elections for the 25th Election District of the 13th Assembly District (in order to entitle him to vote in the coming primary election) giving 395 Oliver Place, Bronx County, as his residence, stating also that he resided there for six months, and that his residence in 1945 was 2995 Botanical Square.

Testimony in the proceeding revealed that the respondent was discharged from the United States Navy on January 11,

1946, at San Pedro, California; that he arrived in New York on January 21, 1946, visited with his parents from January 21, 1946, to February 15, 1946, and on the last-mentioned date moved into the home of a Mrs. Davis at 395 Oliver Place, Bronx County, New York. It is conceded by counsel for the respective parties that 395 Oliver Place is in the 13th Assembly District, but that 2995 Botanical Square was formerly in the 8th Assembly District, and since the realignment of districts effective January 1, 1944, is in the new 8th Assembly District, and that the latter address, that is, 2995 Botanical Square never was and is not now in the 13th Assembly District. Petitioner claims that on the law and facts respondent has not been a resident of the 13th Assembly District prior to February 15, 1946, and thus falls short of the residence requirements set forth in section 7 of article III of the New York State Constitution.

The term residence with reference to the Election Law is synonymous with domicile. Residence simply requires bodily presence as an inhabitant in a given place while domicile requires bodily presence in that place and also an intention to make it one's domicile. To constitute domicile there must exist a union of residence and intention. " Intention alone will not do it, but the two taken together do constitute a change of domicil." (*Dupuy* v. *Wurtz*, 53 N. Y. 556, 561.) Appraised in the light of the standards of controlling authorities the record before the court shows that the deponent acquired a residence in the 13th Assembly District in the month of October, 1945, while in New York on furlough. The testimony on which this assumption is predicated is as follows:

Q. Mr. Calanese, with reference to the conversation that you testified took place in October, 1945, would you please tell us just what that conversation was in reference to the question of Mr. Drohan's residence?

A. When Bill came into the club, —

The Court: Just the conversation.

A. (Continued) That is what I am trying to get to, your Honor. He found out from Louis Tambolini that there had been a redistricting of the Assembly District.

The Court: I will sustain counsel's objection and strike out what he found out from Louis Tambolini. Just confine yourself to the conversation.

Q. Tell us what was said at that time? A. Bill Drohan told me that he had found out that his old address was not in the 13th Assembly District and that he was then going

to use some part of his furlough to look around for a place in the 13th Assembly District, because he didn't want to get away from the Park Republican Club, or from the Assembly District, in which he belonged, or said he belonged, namely the 13th. He then offered me congratulations and good luck on my campaign and told me he had voted at that time and was one of the first to vote for me on a war ballot.

I met him on one or two other occasions while during the furlough and I asked him then if he had secured any place or what he was doing with respect to getting a place and when he was coming out of the service and he thought he would be out of the service shortly.

The Court: He said he thought he would be out of the service?

The Witness: Yes, shortly, and that he was definitely set to be in the 13th, because he had spoken to some woman, whose name I don't recall, but I think the name Davis, he mentioned before, comes to my mind as the person he had spoken to, and that he had made arrangements with her when he was discharged from the service.

The Court: When was that conversation?

The Witness: That was two separate occasions when I had the talk with Mr. Drohan. The first one was about the first week in October, 1945, and the second conversation I think was the following week. I was at the club every night that month of October, but I remember seeing Bill Drohan one week and then again the following week.

Frank J. Bruschi, previously sworn, recalled and testified as follows:

Direct Examination by Mr. Joseph:

Q. Mr. Bruschi, would you please tell us just what was the conversations were that you had with Mr. Drohan in October, 1945, at the Club rooms where reference was made to residence in the district, or anything pertaining to district residence?

Mr. Weston: Same objection, of course.

The Court: Yes, same as made to the preceding witness. Objection overruled. Exception.

A. Bill Drohan came in, — I have a little office up there, — I had somebody inside and the door was closed, — I heard some fuss going on outside and I go outside and for the first time I see Bill Drohan in uniform. I says, "What

is going on?" And he was excited and put out. I says, "Come on inside, Bill." And he come inside and he told me that he had learned for the first time, that Louis Tambolini had shown him the map where he was in the old 8th. I says, "Yes, too bad." Then he says to me, "Well, I don't want to leave you, Frank; I want to stay with you." Well, I says, "If you want to stay with me you must establish your residence in the district." I says, "You are still in the Navy." He says "I will do that." He then wanted to pay me his dues. I said, "I can't accept your dues, Bill; we are not taking any dues from any of our members who are in the armed forces. Now, I says, go back to your ship and when you are discharged come back, establish a residence and you will be a member of the Park Republican Club." He said he would. That is about all that happened.

Cross Examination by Mr. Weston:

Q. Did he tell you where he intended to live or move into the 13th District? A. I asked him did he know anybody, and he says, yes, that he had an old friend in Oliver Place.

Q. He didn't know whether he would move in there? A. He didn't say that. He said he intended when he got out of the Navy to come back and live with this friend.

The Court: When do you say that conversation was?

The Witness: That was in October; that was before he was dismissed. It seems he was on furlough or something, and he came in for a few weeks on visits, and that is the first time I had seen him in three and a half years, since the man had entered the service.

Louis J. Tambolini, previously sworn, recalled and testified as follows:

Direct Examination by Mr. Joseph:

Q. Mr. Tambolini, will you please tell us the conversation that took place with Mr. Drohan in October, 1945, at the club house? A. Bill came in, — he came home on leave, — he was in uniform.

Mr. Weston: Same objection.

The Court: Same objection, same grounds, same ruling. Exception.

A. (Continued) He came to me and told me, after we had spoken about his leave and everything, he said "What district do I vote in this year?" I said, "Where do you live, Bill?" He said, "Botanical Gardens." I said, "Too bad; the district has been cut; you are out of our

district." He said, " Oh, no; I am not out of the district."
He said, " If that is the case, I will have to find myself
a home in the 13th Assembly District." After I explained
the new districts to him. While we were talking Mr.
Bruschi came out of his office and joined the conversation
and I walked away.

Q. Was there any further talk about his residence in
the district at that time? A. Outside of saying he always
lived there, he had always been an active member of the
club and that he wanted to continue so, regardless of where
he would find a place to sleep when he got out of the
service, there was no other conversation.

Mr. Weston: No questions.

The Court: Let the record show that counsel for
respondents desires to recall Mr. Drohan:

William J. Drohan, previously sworn, recalled testified
as follows:

Direct Examination by Mr. Joseph:

Q. So that we have this clear, when did you arrive on
your thirty day shore leave in New York? A. October 5.

Q. And you testified to a conversation that you had with
Mrs. Davis. Can you tell us when that conversation took
place? A. When you asked me that question on direct
your Honor cut me off, if you will remember, — the con-
versation was with her son, Tony Davis, a long term friend
of mine he was, and I told him about the circumstances
about which presently we had testimony, and I told him
I wanted to reside in the 13th Assembly District in Frank
Bruschi's club, and he said, " What do you want to do
about that? " I said, " I want to live in your house." So
then we went over to Mrs. Davis, and she said, " Of course,
Bill, come in any time you want to." I said, " Uncle Sam
has a claim on me, but if God is willing I will be home."

Q. This conversation with Tony Davis, when would you
place that in point of time, so far as October is concerned?
A. It was around that time, about the 15th of October, as
best I can recall.

Q. Now, can you tell us the conversations that you had
at the Park Republican Club with any of the members
with reference to the question of your residence, or what
facts you ascertained and what statements you made con-
cerning that? A. When I come back to the club the first
lad I saw was Johnny Calanese. I shook hands with him.

22

I said, "John, you have already got one vote right here." And the next lad who grabbed hold of my coat sleeve was Louis Tambolini. He pulled me on the shoulder and said he was glad to see me back, and said, "You have already voted?" I told him yes. Then he said "You don't have to register." I said, "Speaking of registering, where do I register now? My family moved to Long Island, and what is what?" He said, "Where did you live before?" I said, "2995 Botanical Gardens," and he laughed at me and he said, Oh, that isn't in their district. I said, "What do you mean, it isn't in their district? It was in the district when we went away." Well, he said, "We have got reapportionment," and he took me over to the map and showed me the old 13th, and showed and explained the way they cut the house, — it is the only house in St. Philip of Neri, not in the 13th Assembly District, my own church. I said, "I don't belong there. That district goes around to Tremont Avenue. I belonged in Frank Bruschi's club." And then Frank Bruschi come out and I tried to pay the dues, but he said "No, if you finally get discharged come back."

Q. Was there any talk in any of these conversations with reference to the Davis Family? A. I said, "I have a party in mind, I will speak to her." And Frank said, "You had better take care of that, because if you want to belong to the club and do us some good on Election Day and go out and vote you will have to do it on Election Day."

Q. Subsequent to this talk had you gone back to the Park Republican Club to tell the result of this conversation? A. I did.

Q. Who did you talk to? A. I talked to Louis Calanese because I said, "Louis, you can carve the district up again but don't carve it up for my sake." I told him I had talked to Tony first and then I seen the mother and arranged when I come out I was to live at her house. I remember that distinctly because that same night Mr. Goldstein was up there to address the club body and that was one of the prime reasons I went to the club.

Mr. Weston: No questions at all.

All this testimony was received in evidence over the objection of petitioner's counsel on the authority of *Matter of Newcomb* (192 N. Y. 238, 251–252) which held: "Intention may be proved by acts and by declarations connected with acts, but it is not

thus limited when it relates to mental attitude or to a subject governed by choice. As we have seen, a person may select and make his own domicile and no one may let or hinder. He may elect between his winter and summer residence and make a domicile of either. The right to choose implies the right to declare one's choice, formally or informally as he prefers, and even for the sole purpose of making evidence to prove what his choice was. Such declarations are not self-serving in an improper sense, unless they are made with intent to deceive. If they are false and made for a sinister purpose, they will meet the fate that falsehood always meets in courts of justice when discovered by the triers of fact.''

The court finds as a fact that the declarations in the instant case were true and fairly showed the intent of the respondent to be a resident of the 13th Assembly District from October, 1945, the date when he for the first time ascertained the boundary lines of the new district, and that coupled with the overt act of physical presence at 395 Oliver Place in the home of Mrs. Davis in October, 1945, plus his arrangements then made with Mrs. Davis, give the respondent a residence of more than one year in the 13th Assembly District. For the court to hold otherwise than that this respondent had established a residence in the 13th Assembly District in October, 1945, although physical occupation thereof had been delayed by reason of his membership in the armed forces, would be equivalent to a judicial pronouncement that this respondent could not acquire a residence other than that which he had prior to his induction into the armed forces, or from which he cast his last war ballot, and that his selection of residence must await his actual physical separation from the service so that he could actually occupy the same and be physically present therein. Using the same argument it would be equivalent to the court declaring that the respondent was saddled with the residence from which he was inducted into the armed services or cast his last war ballot, irrespective of the present nonexistence thereof, or of his intention to abandon such residence and acquire another in its place. It cannot be disputed that as long as respondent remained in service he was unable to be physically present other than at the station to which he was assigned. To hold with the petitioner here would be tantamount to depriving a person in military service in the circumstances of the case at bar of his right to seek public office unless he had been discharged twelve months prior to primary or election day.

24

From the evidence in the case it appears that the respondent had a permanent abode at 395 Oliver Place in the 13th Assembly District, Bronx County, from October, 1945; that his acts and declarations evidence such fact, and that he was a resident of the 13th Assembly District from October, 1945, down to the present time.

Accordingly, respondent's motion to dismiss made at the close of the evidence is granted with appropriate exception to the petitioner. Order signed.